Carey Dunai LOHRENZ Plaintiff,

v.

Elaine DONNELLY, et al. Defendants.

No. CIV. 96–777.

United States District Court, District of Columbia.

Aug. 16, 2002.

Susan Graham Barnes, Denver, CO, Pamela Nagle Hultin and Rodney A. Smolla, McCarthy, Lebit, Crystal & Haiman, Cleveland, OH, for Plaintiff.

Frank Meyers Northam, Webster, Chamberlain & Bean, Washington, DC, Kent Masterson Brown, Lexington, KY, for Elaine Donnelly and the Center for Military Readiness.

Sharon Cummings Giles, Robins, Caplan, Miller & Ciresi, Washington, DC, for Copley Press.

Allen Vern Farber, James Aston Barker, Jr., Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for News World Communication.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Now before the Court is defendants' Motion to Strike Declaration and Report of Captain Charles Nesby [139], plaintiff's Memorandum of Points and Authorities in Opposition to defendants' Motion to Strike Declaration and Report of Captain Charles Nesby, defendants' Reply in Support of Motion to Strike Declaration and Report of Captain Charles Nesby, defendants' Motion for Summary Judgment [119–1] and Motion for Oral Hearing [119–2], plaintiff's Opposition to defendants' Motion for Summary Judgment, defendants' Reply in Support of Motion for Summary Judgment, plaintiff's Cross–Motion for Partial Summary Judgment [133], defendants' Opposition to plaintiff's Cross–Motion for Partial Summary Judgment, and plaintiff's Reply in Support of Cross–Motion for Summary Judgment. Upon consideration of the pleadings, relevant decisions of prior federal and state courts, and the record of this case, the Court will DENY defendants' Motion to Strike [139], GRANT defendants' Motion for Summary Judgment [119–1], DENY defendants' Motion for Oral Hearing [119–2], and DENY plaintiff's Cross–Motion for Partial Summary Judgment [133].

## I. Background

Plaintiff Carey Dunai Lohrenz alleges that defendants Elaine Donnelly and the Center for Military Readiness (CMR) are liable for libel and slander (Count I) and for invasion of privacy (Count IV). All of these claims are governed by the law of the District of Columbia. Plaintiff Lohrenz had originally brought her case against four specified defendants: Donnelly, CMR, Copley Press, News World Communication Incorporated, and John Does 1–100. This Court granted the motion by Copley Press to dismiss the complaint for lack of jurisdiction, and defendant News World Communication has settled with plaintiff. Defendants Donnelly and CMR now move for summary judgment, and plaintiff Lohrenz has filed a cross-motion for partial summary judgment.

Defendant Donnelly is the President and primary spokesperson of defendant CMR, a public policy organization concerned with military personnel issues. CMR was incorporated in Michigan in 1992. Plaintiff alleges that CMR is supported by a small group of retired military officers named as defendants John Does 1–100.

Plaintiff Lohrenz was sworn into the Navy as an officer candidate in November 1990; after training, she received her commission in May 1991. In 1993, plaintiff Lohrenz received her designation as a naval aviator; shortly thereafter, plaintiff was assigned to the F–14 Tomcat. In July

1993, plaintiff reported to the Fleet Replacement Squadron (FRS) VF 124, based at Miramar Naval Air Station, for F–14 training. Plaintiff was one of two women assigned to VF 124 for F–14 training; the other was the late Lt. Kara Hultgreen. Plaintiff received approximately eleven months of instruction in piloting the F–14 and in August 1994, plaintiff joined fighter squadron 213, then attached to the U.S.S. Abraham Lincoln in the Pacific Fleet.

Throughout her training at Miramar and when she was a member of fighter squadron 213, plaintiff was evaluated for her performance and fitness as an F–14 pilot. Lohrenz asserts that her evaluations show that she was an average to above-average F–14 pilot; defendants assert that Lohrenz's evaluation record shows that she was a sub-standard pilot who often received benefits and training that her male counterparts did not receive. The training records will be discussed at more length *infra* sections III and IV.

On October 25, 1994, Lt. Hultgreen was killed while landing an F–14 on the U.S.S. Abraham Lincoln. This tragic event signaled the beginning of a series of events which led to the instant lawsuit. After the death of Lt. Hultgreen, there was a barrage of media articles about the wisdom of the military's recent decision to allow women in combat; many commentators were critical of the military's decision.

In mid-December of 1994, defendant Donnelly spoke on the telephone with and received a letter from a Lt. Patrick Jerome "Pipper" Burns asserting that both Hultgreen and plaintiff had been promoted because of political pressure to incorporate more women into the Navy, and that neither was a qualified pilot. On January 6, 1995, defendant Donnelly met with Adm. Stanley Arthur who was one officer responsible for the training of F–14 pilots; at that meeting, she informed Arthur of her belief that Hultgreen and plaintiff had been carrier-qualified as F–14 pilots only because they were women, and that both should actually have failed out of the program. Admiral Arthur promised to investigate her suspicions, but he neither confirmed nor denied the facts in defendant Donnelly's possession. On January 16, 1995, defendant Donnelly sent a letter to Senator Strom Thurmond (hereinafter the "Thurmond letter"), repeating and describing the facts and allegations made in the letter from Lt. Burns. Defendant Donnelly asserted that both Lt. Hultgreen and plaintiff Lohrenz were unqualified to be fighter pilots, and had received their positions as a result of political pressure. In the Thurmond letter, plaintiff Lohrenz was not identified by name; she was referred to only as "Pilot B" in a purported effort to protect her identity. It was, however, well known that there were only two women carrier-qualified as F–14 pilots, so plaintiff's identity as "Pilot B" was no mystery to other naval aviators, other officers and crew aboard the U.S.S. Abraham Lincoln, and any other individuals who were familiar with the naval aviation community. In addition, plaintiff Lohrenz's actual identity as "Pilot B" was subsequently revealed by various newspapers. *See* Defs. Mot. for Summary Judgment, Exh. 11 to Lohrenz Dep. (San Diego *Union–Tribune* article); *id.*, Exh. 14 to Lohrenz Dep. (*Washington Times* article).

Sometime between October 28, 1994 and April 1995, the FRS training records of Hultgreen and plaintiff were removed from confidential Navy files by fellow officers who served with them at VF 124 or at fighter squadron 213.[1] Portions of those records were transmitted to defendant

---

1. One officer, Lt. Patrick Burns has admitted his involvement. Plaintiff alleges that other unknown officers were involved.

Donnelly by Lt. Burns. Defendant Donnelly had two further meetings with Adm. Arthur (on Febraury 8 and March 24, 1995), one telephone conversation with Adm. Arthur (March 6, 1995), one meeting with Adm. Mike Boorda (on March 6, 1995), who was also involved with the F–14 training program, and one conversation with Commander Thomas Sobieck (date unknown), the commanding officer of the FRS. During those conversations, Arthur, Boorda and Sobieck discussed defendant Donnelly's research and information with her; all three believed that defendant Donnelly was incorrect in her conclusions, and they communicated this to her. At the March 24, 1995 meeting with Adm. Arthur, defendant Donnelly was shown a copy of a Report authored by Rear Adm. Lyle G. Bien, which had been prepared in response to the allegations made by Donnelly in her March 6 meeting with Arthur. That report confirmed many of the facts then known to defendant Donnelly, but concluded that Hultgreen and plaintiff had been promoted according to the usual Navy standards.

On April 25, 1995, defendants Donnelly and CMR published a Special Report entitled "Double Standards in Naval Aviation" (hereinafter "the Donnelly Report"). *See* Pl. Cross–Mot. for Summary Judgment, Exh. 17 (Donnelly Report). The Donnelly Report republished the letter sent to Senator Thurmond and included additional excerpts from plaintiff's training records and comments from letters from male aviators criticizing plaintiff Lohrenz and Lt. Hultgreen. The allegations in the Donnelly Report were that female and male naval aviators were treated differently because female aviators were promoted on a lower standard, that female aviators received special concessions, that people who criticized the Navy's policy of incorporating women into combat positions were unfairly attacked, and that plaintiff was one pilot who received special treatment which per-

mitted her to advance. In the Donnelly Report, plaintiff Lohrenz was referred to only as "Pilot B," but her training records- with particular dates, locations, and scores- were reported.

Copies of the Donnelly Report were circulated on the U.S.S. Lincoln and among the naval aviation community at large, the general public, and the national news media. After the publication and circulation of the Report, plaintiff Donnelly was contacted by Commander Thomas Sobieck, commander of VF 124 where plaintiff and Hultgreen received their F–14 training. Sobieck told Donnelly that he believed her report to be false and misleading, and he urged her to withdraw the report because of its falsity and because he believed that the report would be harmful to the continued training of plaintiff as an F–14 pilot. Defendant Donnelly declined, and continued to promote the Report and its findings through various media sources. In addition to various press releases by defendants, on March 28, 1996, defendant Donnelly gave a speech at the Army–Navy Club in Washington, D.C., essentially repeating the findings of the Report and again referring to plaintiff only as "Pilot B."

After the publication of the Donnelly Report, plaintiff alleges that her performance declined, and her commanders became overly critical. Plaintiff was eventually removed from flight status on May 30, 1995. She then appeared before a Field Naval Aviation Evaluation Board (FNAEB). An FNAEB may be convened to evaluate the performance, potential, and motivation of a particular serviceperson for a particular assignment. The FNAEB considered the evidence against plaintiff and concluded that she should retain flight status but be assigned to fly in a different aircraft. Plaintiff was not, in fact, returned to flight status at that time because her commanding officer, Adm. Yakely, rec-

ommended that she be removed from flight status entirely.

On February 10, 1997, the Navy Inspector General released a report (hereinafter "the Inspector General Report") which is the subject of extreme disagreement between the parties. The Inspector General Report reviewed allegations by plaintiff and her parents against the FNAEB Report, and concluded that one of their allegations was substantiated.

In the fall of 1997, the Navy decided to remove Lt. Burns' name from the promotion list because he had admitted to sending defendants copies of plaintiff's training records and had spoken out against the Navy's carrier-qualification of Lt. Hultgreen and plaintiff. In November of 1997, defendants issued a press release entitled, "Navy Faces Crucial Choice: Principle or Public Relations?" which criticized the Navy for disciplining Burns. In that press release, defendants repeated their allegations that plaintiff was not a qualified pilot and had benefitted from preferential treatment.

Plaintiff asserts that defendants were aware of, recklessly disregarded, or were negligent about the possibility that the allegations against plaintiff were, in fact, false. Defendant Donnelly never reviewed a complete copy of plaintiff's training records, and from January to May of 1995, defendant Donnelly spoke with various Navy officers who disputed the conclusions that defendant Donnelly had drawn about the training of female pilots. After the publication of the Donnelly Report, plaintiff alleges that defendants were informed that the allegations were false, and defendants refused to retract the Donnelly Report and continued to publicize their allegations. Plaintiff further asserts that in the Donnelly Report, plaintiff's training records were selectively edited and mislabeled to create the impression that plaintiff was not a qualified pilot. Defendant Donnelly asserts that she was not aware, did not recklessly disregard, and was not negligent about the possibility that the allegations might be false; in fact, defendant continues to assert that the allegations about plaintiff are true.

Plaintiff asserts that as a result of the actions of defendants Donnelly and CMR, plaintiff has suffered great embarrassment and humiliation, irreparable injury to reputation and good standing in the naval aviation community, economic losses, and loss of her career as both a naval aviator and any opportunity for a career in civil aviation.

## II. Motions to Strike

■ The parties have filed various motions to strike materials submitted in opposition to their motions. In ruling upon these motions to strike, the Court notes that both parties appear to be engaged in fairly transparent attempts to use motions to strike in order to control the merits of the case. A motion to strike is not an appropriate vehicle through which to contest the credibility of a witness or to draw further attention to the fact that one piece of evidence is contradicted by another.

### A. Defendants' Motion to Strike the Declaration and Report of Captain Charles Nesby

Defendants move to strike the Declaration and Report of Captain Charles Nesby, included as Exhibit 1 to plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendants' Motion for Summary Judgment.[2] Plaintiff seeks to

---

2. Defendants have filed a motion to strike the Nesby Declaration [139], but give further reasons for their motion to strike in their Reply in Support of Motion for Summary Judgment.

The Court will address all the arguments given by defendants with respect to the Nesby Declaration in this section.

designate Nesby as an expert in F–14 training and piloting, and represents that Nesby will testify about plaintiff's training records and evaluations, his own personal observations of plaintiff's performance, the validity of the evaluations by other pilots, general and specific principles of pilot training and F–14 pilot training, and other issues related to F–14 pilot training and evaluation such as terminology, common practices, and standards. *See* Pl. Designation of Expert Witnesses, filed August 12, 1999, at 8–11. In his Declaration, Report, and Supplemental Report, Nesby details his qualifications as an expert witness in piloting F–14s and training F–14 pilots. Nesby entered flight school in 1974 and was designated a naval aviator in 1975. In 1977, Nesby was trained to fly the F–14; in 1981, Nesby became an F–14 flight instructor. Nesby trained F–14 pilots for three years, was in charge of developing and writing the manual for operating and piloting the F–14, and received several levels of qualification to train new pilots. Captain Nesby ascended through various ranks, and has now been appointed the Director of the Center for Minority Veterans in the Department of Veterans Affairs. In short, it appears that Captain Nesby is intimately familiar with flying the F–14 and training F–14 pilots. His opinions that he now asserts are based on

> my own personal observations of LT Lohrenz when she went through Advanced Jet Training course at NAS Kingsville while I was Commander of Training Air Wing TWO, my own background and experience as an F–14 pilot, my experience as an instructor in the F–14 Fleet Replacement Squadron, the objective facts disclosed by the Navy's records pertaining to LT Lohrenz training, the reports and evaluations of the naval officers who conducted her FRS training at VF 124, and the several reports of Navy and Department of Defense investigations into Ms. Donnelly's allegations

against LT Lohrenz and the Navy personnel responsible for her training in the F–14 Fleet Replacement Squadron.

Pl. Opp., Exh. 1 (Nesby Decl.) at 13. Based on those materials and experiences, Nesby avers that plaintiff was a qualified pilot and that the practices for which defendants' report find fault were actually quite common among F–14 pilots of experience comparable to plaintiff's.

Defendants move to strike Nesby's Declaration on several grounds: (1) because the declaration does not comply with Federal Rule of Civil Procedure 26(a)(2)(B); (2) because Nesby is incompetent to render opinions under Federal Rule of Evidence 702, which governs testimony by experts; and (3) because Nesby's instant Declaration is contradicted by testimony that he gave before the Navy Inspector General and other evidence now before the Court.

1. Plaintiff's Failure to Comply with Federal Rule of Civil Procedure 26(a)(2)(B)

Federal Rule 26(a)(2)(B) provides a party submitting expert testimony must provide:

> a written report prepared and signed by the witness, a complete statement of all opinions to be expressed and the basis and reasons therefor, the data or other information considered by the witness in forming the opinions, any exhibits to be used as a summary of or support for the opinions, the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years, the compensation to be paid for the study and testimony, and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2)(B). It appears plain that plaintiffs have not complied with this rule. Plaintiffs have failed completely to disclose a list of all publications authored by Nesby, the compensation paid to Nesby, and a listing of any other cases in which Nesby has testified or been deposed. Plaintiff's only explanations of the failure to provide this information are that defendant should have complained about this earlier, that defendant failed to provide similar information, and that plaintiff is in the process of compiling this information. The first two explanations are meritless-finger-pointing by the parties misunderstands the purpose of the rule mandating these disclosures. *See Nguyen v. IBP, Inc.,* 162 F.R.D. 675 (D.Kan.1995) ("The 1993 amendments to the Federal Rules of Civil Procedure which instituted the disclosure requirement were an attempt to assure that all parties disclosed certain information concerning their expert witnesses, including certain background facts which would enable a party to prepare for cross-examination at deposition or trial").

Despite plaintiff's failure to comply with Rule 26, the failure to comply with the disclosure rule will not result in that expert's testimony being stricken unless the failure was prejudicial to the party entitled to the disclosure. *See id.* Defendants do not aver that any prejudice resulted from the plaintiff's failure to make the required disclosures. Accordingly, the motion to strike will not be granted for plaintiff's failure to comply with the terms of Rule 26(a)(2)(B).

2. Defendants' Objection that Nesby Is Not Qualified as an Expert

Defendants second objection is that Nesby's declaration is incompetent and inadmissible pursuant to Federal Rule of Evidence 702, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The Court must ensure that the testimony of the proffered expert testimony is both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ Defendants first assert that Captain Nesby is unqualified to render the opinions included in his Declaration and attached letter, and that his Declaration should therefore be stricken. They assert that Captain Nesby did not observe plaintiff when she trained at NAS Miramar or while she served in Fighter Squadron 213 aboard the Abraham Lincoln, and that Captain Nesby has not published anything about F-14 training, has never testified anywhere, and is not paid. Contrary to defendants' assertions, it is not necessary for Nesby to have had any contact with plaintiff; it is quite ordinary and, in fact, expected for an expert witness of this type not to have had long-term, prolonged interaction with a party. Defendants' assertions that Nesby is not published (although apparently Nesby is in the process of compiling a list of publications for the parties), has not testified, and is not being paid are similarly unconvincing; these are not prohibitions on Captain Nesby's status as an expert witness, particularly in his asserted area of expertise-piloting F-14s and training F-14 pilots-because it is certain that this area would require intense practical experience, and F-14 pilots are probably not frequently called to testify about their expertise. According to the uncontested

statements in his Declaration, Captain Nesby has had a long history of piloting the F–14 and of training and evaluating other F–14 pilots. It appears that he is intimately familiar with the method and practice of evaluating F–14 pilots, and what may be reasonably expected from an officer who seeks to become an F–14 pilot. This is an area of fact where technical expertise dominates and where the Court and jurors would likely be inexperienced; Captain Nesby would likely be able to "assist the trier of fact." Fed.R.Evid. 702.

■ Defendants next seek to have the Nesby declaration stricken from the record because they believe that the plaintiff has submitted the declaration to prove malice, which would be a required element of liability for Counts I and IV if plaintiff were to be found a limited-purpose public figure. Defendants argue that Nesby is not an expert in libel or slander, and therefore may not render any opinion on actual malice. Defendants are correct in asserting that courts have generally disfavored expert testimony in determining actual malice, which is essentially a determination of defendants' subjective state of mind. *See Tilton v. Capital Cities/ABC Inc.,* 938 F.Supp. 751, 753 (N.D.Okla.1995); *World Boxing Council v. Cosell,* 715 F.Supp. 1259 (S.D.N.Y.1989). It is true that there are some statements in Nesby Declaration and attachments that could be construed to imply malice by defendants. For example, Nesby asserts that "Donnelly was careful to protect the identity of her informant, which persuades me that she knew when she asked the officer to provide her with copies of the training records that she was encouraging him to violate federal law." Pl. Cross–Mot. for Summary Judgment, Exh. 1 (Nesby Decl.), Att.2 at 2. Further, Nesby avers that

> [t]he selective use of a few records, the misrepresentations of the meaning of the records she did use, and the magni-

tude of the deception dictates only one conclusion-that Elaine Donnelly and the people who helped her intended to deceive the Senate Armed Services Committee, LT Lohrenz' superiors in her chain of command, and, after release of the CMR report, LT Lohrenz' fellow officers and the general public.

*Id.,* Exh. 1 (Nesby Decl.), Att. 2 at 2. It is clear that the plaintiff may not establish malice, a subjective state of mind, solely through expert testimony, and that an expert in piloting F–14s and training F–14 pilots may not render legal opinions concerning defendants' alleged malicious or deceptive motives. The Court will therefore not consider any statements made by Captain Nesby to render any expert opinion as to whether defendants acted maliciously or deceptively; this limitation on the Court's construction and interpretation of Captain Nesby's Declaration, however, still falls far short of supporting the notion that Captain Nesby's Declaration should be stricken from the record.

■ Defendants also assert that Captain Nesby's Declaration cannot be used to support any possible conclusions about damages; that is, Captain Nesby asserts that but for Donnelly's statements and the CMR Report, plaintiff would be a pilot in civil commercial aviation or would be "flying missions over Afghanistan today." *Id.,* Exh. 1 (Nesby Decl.), Att. 2 at 2. Captain Nesby further opines that "the false allegations concerning the content of Lohrenz' FRS training records made and publicized by Elaine Donnelly created unusually [sic] stresses on LT Lohrenz which ultimately caused her to lose her career as a combat pilot." *Id.,* Exh. 1 (Nesby Decl.), Att. 2 at 13. According to the qualifications listed in his Declaration, Nesby is not qualified to render opinions about the standards of piloting in civil commercial aviation, nor does he have a true basis upon which to

draw a connection between the stress plaintiff felt as a result of the CMR report and her ultimate termination. Again, though the Court does not consider Nesby an expert in civil commercial aviation or in psychology and will not construe any statements in his Declaration which might support any possible calculation about damages, defendants do not contest his expertise in piloting F–14s and training F–14 pilots, and his Declaration therefore shall not be stricken from the record.

 Defendants' last assertion with respect to Nesby's qualification as an expert and his ability to render opinions is that Nesby relies on hearsay and other forms of inadmissible evidence. Experts are entitled to rely on inadmissible forms of evidence, as long as the evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. Therefore, Nesby is entitled to rely on hearsay and other forms of inadmissible evidence, if those inadmissible forms of evidence would normally be relied upon by others with expertise in the area of flying F–14s and training F–14 pilots.

3. Defendants' Objection that Nesby's Declaration and Opinions Contained Therein Are Contradicted by Other Evidence

 Defendants assert that Capt. Nesby gave contradictory testimony before the Navy Inspector General, *see* Defs. Reply in Support of Mot. for Summary Judgment, Exh. 5 to Donnelly Suppl. Aff., and that his Declaration in this case is contradicted by the FNAEB Report, *see* Defs. Mot. for Summary Judgment, Exh. 9 to Donnelly Aff., and by the Navy Inspector General Report, *id.*, Exh. 10 to Donnelly Aff. Mere inconsistency and contradiction is insufficient to support a motion to strike a document from the record, particularly where, as here, the document that defen-

dants seek to strike is a sworn Declaration signed under penalty of perjury.

In sum, the Court finds that defendants have failed to proffer sufficient reasons that the Declaration of Captain Nesby should be stricken from the record of this case, and the Court therefore DENIES the motion to strike.

B. Plaintiff's Motion to Strike the Field Naval Aviators Evaluation Board (FNAEB) Report

In her opposition to the defendants' Motion for Summary Judgment, plaintiff moves to strike the FNAEB Report which was proffered by defendants as exhibit 5 to the Affidavit of Lt. Burns and as exhibit 9 to the Affidavit of Elaine Donnelly. *See* Pl. Opp. to Defs. Mot. for Summary Judgment at 60–61. Plaintiff asserts that the FNAEB Report was unreliable hearsay, the product of "unlawful command influence," and was subsequently invalidated by the Department of the Navy. Plaintiff asserts that the FNAEB Record is not an admissible business record because there has been no witness or affidavit to aver that the FNAEB Record meets the requirements of that exception to the hearsay rule. Defendant counters that the FNAEB Report is admissible under Federal Rule of Evidence 803(8) as a public record.

 It is clear that the FNAEB Record would normally be considered admissible pursuant to Rule 803(8) because records of government agencies are normally found admissible under that provision. *See, e.g., Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *Distaff, Inc. v. Springfield Contracting Corp.,* 984 F.2d 108 (4th Cir.1993). The Record may, however, be inadmissible if the plaintiff can show that it is not trustworthy. Factors that may be used to determine the trust-

worthiness of the report are: "(1) the timeliness of the investigation; (2) the special skill or experience of the official; and (3) possible motivational problems." *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300–01 (4th Cir.1984). "Other factors may indicate a lack of trustworthiness: unreliability, inadequate investigation, inadequate foundation for conclusions, invasion of the jury's province." *Distaff, Inc.*, 984 F.2d at 111. If a record is found to be admissible under Rule 803(8), no foundational testimony is required. *See United States v. Doyle*, 130 F.3d 523, 546 (2d Cir.1997).

The first relevant factor in this instance is timeliness. The investigation was timely; it was submitted on May 30, 1995, which is exactly during the time period when the primary events leading to this lawsuit transpired. The second relevant factor is the special skill or experience of the officials. The officials who completed the FNAEB Report were Lt. Cmdr. Warren S. Ryder, Lt. Cmdr. John Fristachi, Lt. Robert Roberts, Lt. Brenda Scheufele, and Lt. Sharon Miller; neither party contests the skills or experience of the officials.[3]

The third relevant factor is "possible motivational problems." Plaintiff has more fertile ground to plough here; the FNAEB Report and recommendations were criticized by a subsequent report by the Navy Inspector General, *see* Defs. Mot. for Summary Judgment, Exh. 6 of Burns Dep. (Inspector Gen. Rept.) ¶¶ 415–44. The Navy Inspector General concluded that an allegation that the FNAEB Report was tainted by "inconsistencies, inaccuracies and emotionalism" was "substantiated." *See id.*, Exh. 6 of Burns Dep.

(Inspector Gen. Rept.) ¶¶ 415–44. Further, plaintiff proffers the statement of Cmdr. F.J. Kilian, the commanding officer who convened the FNAEB and ultimately approved its findings and recommendations. Kilian asserts that he did not properly review the plaintiff's training records, that had he reviewed the training records he would not have agreed with the conclusions of the FNAEB, that he was influenced by his authorities to approve the report, and that he now wishes to repudiate his approval of the FNAEB Report.[4] *See* Pl. Cross–Mot. for Summary Judgment, Exh. 2 (Kilian Decl.). Although the Court certainly notes that both the Navy Inspector General and the officer who approved the FNAEB have both criticized the FNAEB Report, these concerns appear to ultimately drive more at the weight the FNAEB Report should be accorded, not its admissibility. The fact that the parties so hotly dispute the credibility of their various sources, and are adept at pointing out the inconsistencies between various reports and witnesses, further inclines the Court to admit the FNAEB Report and the Nesby Declaration. Accordingly, plaintiff's motion to strike the FNAEB Report is DENIED.

## C. Defendants' Motion to Strike the Declaration of Frederick J. Kilian

Defendants move to strike the Declaration of Frederick J. Kilian, proffered as exhibit 2 to plaintiff's Opposition to defendants' Motion for Summary Judgment and discussed briefly *supra* § II.B, asserting that the declaration is "rife" with inadmissible hearsay and is contradicted by other documents and evidence, including his own

---

3. Plaintiff Lohrenz specifically stated at the time that the FNAEB was convened that she did not object to the membership of the Board. *See* Defs. Mot. for Summary Judgment, Exh. 5 of Burns Dep. at 5.

4. Defendants have moved to strike the Kilian Declaration, asserting that it is actually untrustworthy, perjurious, and includes facts and conclusions that are blatantly impossible; defendants' motion to strike the Kilian Declaration is discussed *infra* § II.C.

prior sworn statement. Defendants point to one statement which they allege is inadmissible hearsay; Kilian avers that his commanding officer "made it clear" to him that Kilian should give plaintiff the opportunity to discontinue her aviation career. Although the Court recognizes that there may be hearsay contained within a single paragraph in a seven-page Declaration, this is insufficient for the Court to find that the declaration should be entirely stricken from the record. *Cf. Quality Inns Int'l, Inc. v. Tampa Motel Assoc., Ltd.*, 154 F.R.D. 283, 288 (M.D.Fla.1994) ("Motions to strike are generally viewed with disfavor and are infrequently granted.").

Defendant further asserts that the Kilian Declaration should be stricken because it contradicts testimony that he gave to the Navy Inspector General, *see* Defs. Mot for Summary Judgment, Exh. 12 to Donnelly Aff., and contradicts other Navy documents and records. Mere inconsistency and contradiction is insufficient to support a motion to strike a document from the record, particularly where, as here, the document that defendants seek to strike is a sworn Declaration signed under penalty of perjury. Accordingly, defendants' Motion to Strike the Declaration of Frederick J. Kilian is DENIED.

III. Defendants' Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment

Defendants Donnelly and CMR have moved for summary judgment on Count I, libel and slander, and Count IV, invasion of privacy. Plaintiff has filed a cross-motion for partial summary judgment for (1) an order finding that plaintiff was a private individual and not a public figure; or, alternatively (2) an order finding that defendants did act with "actual malice" when they published the allegedly defamatory statements about plaintiff Lohrenz.

Plaintiff's Count I for libel and slander includes two distinct but related torts; both fall under the umbrella category of "defamation." In order to prevail on a claim of libel in the District of Columbia, a plaintiff must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Klayman v. Segal*, 783 A.2d 607 (D.C.2001). In order to prevail on a claim of slander in the District of Columbia, a plaintiff must show that the defendant made an oral statement that was false and defamatory which tends to injure the plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community. *Smith v. District of Columbia*, 399 A.2d 213 (D.C.1979).

Both parties now seek summary judgment on the standard of fault to which defendants may be held in actions for libel and slander. Defendants assert that plaintiff is a limited-purpose public figure, and the standard of fault is therefore governed by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which requires plaintiff show that defendants acted with "actual malice" in publishing the allegedly defamatory statements. Plaintiff has made a cross-motion for summary judgment for an order finding that plaintiff was a private individual, and that the standard of fault that plaintiff must prove is merely negligence. Because the factual and legal issues at the heart of these motions for summary judgment on the issue of whether plaintiff was a "private individual" or a "public figure" are

closely intertwined, the Court will address the motions together.

If the Court does find that plaintiff was a public figure, defendants assert that plaintiff will be unable to show "actual malice," and that defendants are therefore entitled to summary judgment on Counts I and IV. Plaintiff moves for an Order finding that defendants did, in fact, act with "actual malice."

In the alternative, defendants have asserted two additional defenses: (1) that the statements alleged to be "false and defamatory" were actually "substantially true," and defendant may therefore not be held liable for the statements; or, alternatively (2) that defendants' statements were protected by the "Fair Reporting" doctrine that is recognized in the District of Columbia. These arguments will be discussed *infra* section III.B.4.

 Defendants' motion for summary judgment on Count IV, invasion of privacy, is governed by a distinct but related body of law. Although there are significant differences between an action for defamation, which compensates the plaintiff for damage to reputation, and invasion of privacy, which compensates the plaintiff for the mental distress associated with exposing private matters to public view, the heart of both torts is the harm that a plaintiff suffers from others being informed of a fact which was actually false and defamatory. In order to prevail on a claim of invasion of privacy for false light, a plaintiff must show: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person. *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C.1999). Because the Supreme Court has held that *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), does apply to

actions for invasion of privacy, *Time Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), if defendant is a media defendant (as is conceded by both parties here) and plaintiff is a public figure (discussed *infra* § III.A), then plaintiff must show that the defendant committed the tort of invasion of privacy with "actual malice." The determination of whether plaintiff is a public figure is, therefore, highly relevant to both Counts I and IV.

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party, but the non-moving party must proffer proper evidence to support any material factual assertions. *See Bennett v. Spear,* 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[A] plaintiff must set forth by affidavit or other evidence specific facts to survive a motion for summary judgment . . .").

### A. Limited–Purpose Public Figure Doctrine

 Both parties agree that plaintiff Lohrenz was neither an "all purpose" public figure nor a public official. Defendants assert, however, that plaintiff Lohrenz was a "limited purpose" public figure, and that she must therefore prove that defendants acted with "actual malice" in publishing a defamatory falsehood. Plaintiff asserts that she is a private figure, that she was unwillingly thrust into the media spotlight, and that defendants may therefore be held liable if they negligently published defamatory falsehoods about her. The question of whether plaintiff was a private individu-

al or a limited purpose public figure is a question of law for the Court to resolve. *See Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.1987) (en banc).

The Supreme Court has held that a media defendant may not be liable for defamation unless the plaintiff is able to prove that the defendant published a defamatory falsehood with "actual malice"; that is, the defendant must have published the defamatory falsehood with knowledge that it was false or with reckless disregard of its veracity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Media defendants are, however, only entitled to the protection of this heightened standard when the defamatory statement was published about a public official or a public figure; if the defamatory falsehood had been published about a private individual, then privacy rights trumped First Amendment freedom, and state law would govern any action for the defamation. *See id.* The Court reasoned that there was a First Amendment right to criticize public officials and public figures, and any less restrictive legal standard would cause the media to self-censor for fear of legal liability for false statements. Further, the Court noted that public figures would have access to media outlets to correct any misstatements.

The Court subsequently extended the application of *New York Times* to cover defamatory falsehoods against plaintiffs who, although private individuals, had voluntarily or involuntarily become involved in an issue of general or public interest. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[I]t may be possible for someone to become a public figure through no purposeful action of his own ..."); *Rosenbloom v. Metromedia Incorporated,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) ("If a matter is a subject of public or general interest, it cannot suddenly be-come less so merely because a private individual is involved, or because in some sense the individual did not voluntarily choose to become involved."). In determining whether a private individual has become a "limited purpose public figure," the Court should examine the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997.

As discussed briefly above, the reach of *New York Times* and its progeny has been further extended to invasion of privacy claims by public figures. *Time Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). Therefore, the same analysis by which the Court determines whether plaintiff is a private or limited-purpose public figure will determine the standard of fault in both Count I and Count IV.

In the instant case, the parties agree on the general facts underlying the dispute about whether plaintiff Lohrenz was a private individual or a limited-purpose public figure. First, the parties agree that in general, plaintiff Lohrenz did not actively seek out the attention of the media. Nonetheless, plaintiff Lohrenz did attract the attention of the media because of the fact that she was one of the first women assigned to pilot the F–14 Tomcat. On May 23, 1993, an article about plaintiff Lohrenz appeared in the Green Bay *Press Gazette* publicizing the fact that plaintiff was potentially the first female Training Command graduate to receive orders to move directly into a combat designation. *See* Defs. Mot. for Summary Judgment, Exh. 1 to Lohrenz Dep. In that article, which included a picture of plaintiff and was entitled "Skills propel woman pilot," plaintiff was quoted as saying, "A plane

doesn't know if a man or a woman is flying it. It's the person who's flying it and that person's ability that counts." On September 7, 1993, an article appeared in the Milwaukee *Journal*, entitled "Pilot May Be First to Break a Navy Gender Barrier." *Id.*, Exh. 2 to Lohrenz Dep. Plaintiff Lohrenz was quoted as saying, "I don't get any preferential treatment because I'm a woman, and the guys in my squadron treat me as an equal." One year later, an article entitled "The Jet Doesn't Know the Difference" ran in *The Compass*, which is distributed primarily within the naval aviation community. Pictures and quotes from plaintiff Lohrenz and Lt. Hultgreen figured prominently in that article. *Id.*, Exh. 4 to Lohrenz Dep. Lohrenz discussed her reactions when she was told that the policy against women in combat had changed: "I was in tears, … I couldn't believe all the guys I had gone through flight school with, and had worked so hard and competed with and done well, were going to go out to the fleet and get a chance and I wasn't going to have my chance. And on that Wednesday the Defense Secretary came out and said off the books goes this law, we're going to allow women in aviation combat." *Id.*, Exh. 4 to Lohrenz Dep. On September 9, 1994, a second article appeared in *The Compass*, entitled "Blacklions fly into naval aviation history," which featured the name and photograph of plaintiff. Plaintiff Lohrenz was quoted as saying, "I'm relieved to have made it. But I know that there's a big challenge ahead. A lot of eyes are going to be on me, and I'll have to prove myself just like any other new guy in the squadron." *Id.*, Exh. 5 to Lohrenz Dep. Plaintiff was further quoted as saying, "I think we've opened some doors, and the more exposure we get the more people can see that women can do this." *Id.*, Exh. 5 to Lohrenz Dep. On October 14, 1994, the Mountain Lake *Observer Advocate* published an article entitled, "Carey Lohrenz makes history, joins Navy Fighter Squadron," which included many of the quotes already cited. *Id.*, Exh. 6 to Lohrenz Dep. On October 22, 1994, the Green Bay *News–Chronicle* published an article entitled, "Green Bay woman makes history," which included many of the quotes already cited. *Id.*, Exh. 7 to Lohrenz Dep. Plaintiff Lohrenz's face was even used on a Navy recruiting poster.

After the death of Lt. Hultgreen, the media scrutiny of the issues surrounding women in the military intensified; newspaper articles and television and radio programs covered the intensifying debate over whether women were being promoted too quickly for political purposes and whether, specifically, women were suited for intense, dangerous jobs like piloting F–14s. Media reports about the issue of women and the military appeared in the San Diego *Union–Tribune*, a local San Diego news program on KNSD–News, the *New York Times*, the *Navy Times*, CBS Morning News, the Chicago *Tribune*, the *Air Force Times*, Nightline, *USA Today*, the *Detroit News*, and the Los Angeles *Times*. *See* Defs. Mot. for Summary Judgment, Exhs. 8–35.

The Court of Appeals for this Circuit has previously addressed the distinction between "private individuals" and "limited-purpose public figures," holding that "a person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1292 (D.C.Cir.1980). The *Waldbaum* court set out a three-part test to determine whether an individual may be categorized as a "limited purpose public figure." The court must first isolate the public controversy; the controversy must

be "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Id.* at 1296. In the instant case, it is clear that there was a public controversy both before and after the death of Lt. Hultgreen. The public controversy concerned the role of women in the military and whether women should be allowed in combat; after the death of Lt. Hultgreen, the media coverage was extended to include a debate over whether the military, in its haste to incorporate women into its ranks, promoted certain women too quickly and under more lax standards. It is clear to the Court that both before and after the death of Lt. Hultgreen, there was a "public dispute" that had "foreseeable and substantial ramifications for persons beyond its immediate participants."

The second step of the *Waldbaum* analysis is an examination of the plaintiff's role in the controversy; "trivial or tangential participation" will not suffice to thrust a plaintiff into the role of a "public figure." *Id.* at 1297. In analyzing the plaintiff's participation, the court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to plaintiff's conduct and statements. In this case, plaintiff's past conduct certainly supports a finding that she was a limited-purpose public figure. Plaintiff was one of two women to have qualified for one of the most dangerous combat positions in naval aviation. Plaintiff gave numerous statements to the media and appeared on television shows both before and after the death of Lt. Hultgreen commenting about her position and the fact that she was a forerunner in the military's attempt to integrate women into combat positions.

Plaintiff asserts that despite these numerous incidents of media coverage, she did not "thrust" herself in the media spotlight, and the *New York Times* standard therefore does not apply. Contrary to plaintiff's argument, it is well-settled that private individuals may become limited-purpose public figures unwillingly without voluntarily thrusting themselves into the public eye. *See Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C.Cir. 1985) (holding that air traffic controller involuntarily became a limited-purpose public figure after intense media coverage of an airplane accident while he was on duty). Moreover, plaintiff voluntarily gave statements about her assignment as an F-14 pilot and about her status as one of the first female F-14 pilots, and she was well-aware that her position as one of the first female F-14 pilots would attract public attention. *See Clyburn v. News World Comm., Inc.*, 903 F.2d 29, 33 (D.C.Cir. 1990) (holding that plaintiff was a limited-purpose public figure because his contracts with the District of Columbia government and his propensity for "hobnobbing" with government officials raised the chances that the public would become interested in his affairs).

The extent of the press coverage also inclines this Court to hold that plaintiff was a limited-purpose public figure. The debate about the role of women in the military, and plaintiff Lohrenz in particular, received both local and national media attention. Plaintiff Lohrenz was named, quoted, and pictured in print and television media outlets. Lastly, there was a definite public reaction to plaintiff's conduct and statements. Although the level of opposition to plaintiff's position as an F-14 pilot rose significantly after the death of Lt. Hultgreen, it is clear that from the outset, before the death of Lt. Hultgreen, there was substantial public interest in plaintiff's assignment to the F-14.

In sum, the second prong of the *Waldbaum* analysis supports a finding that plaintiff Lohrenz is a limited-purpose public figure; plaintiff was a central figure in

the public controversy over the place of women in the military, and she was featured prominently in much of the media coverage about that issue.

In the third prong of the *Waldbaum* analysis, the Court must determine whether the "alleged defamation must have been germane to the plaintiff's participation in the controversy." *Waldbaum*, 627 F.2d at 1298. It is clear in this instance that the alleged defamation was germane to the plaintiff's participation in the controversy; defendants allegedly defamed plaintiff Lohrenz by asserting that she was an unqualified pilot and had been promoted because she was a woman, and plaintiff's participation in the controversy included statements that she was as well-trained as the male pilots and had been promoted under the same standards applied to the male pilots.

In her opposition to defendants' motion for summary judgment and in her cross-motion for summary judgment, plaintiff asserts that she is not a limited-purpose public figure because her "name and likeness" were not used frequently; her argument is based on *Dameron v. Washington Magazine, Incorporated,* 779 F.2d 736 (D.C.Cir.1985), where the D.C. Circuit Court of Appeals held that an air traffic controller who was on duty during an airplane crash was a "limited purpose" public figure, albeit involuntarily, for the purposes of the public controversy about whether there were errors in air traffic control procedures. The *Dameron* court noted that one reason that Dameron became a limited-purpose public figure was because his "name and likeness were often used in these reports." *Id.* at 742. Plaintiff has inflated this specific factual notation to virtually an entire separate prong of the *Waldbaum* analysis, arguing that unless plaintiff Lohrenz's name and likeness were often publicized, she cannot be found to be a limited-purpose public figure.

This understanding of *Dameron* and *Waldbaum* is incorrect; the use of a plaintiff's name and likeness is certainly one factor that would incline the Court to hold that plaintiff was a limited-purpose public figure, but it is not an absolute necessity if other facts are present showing that plaintiff satisfies the *Waldbaum* three-part test. Moreover, plaintiff's name and likeness were used with some frequency, as noted above. Although it is true that in many articles plaintiff was referred to generically as one of two women who had qualified as F–14 pilots, and was referred to by defendants in the Thurmond letter and the Donnelly Report only as "Pilot B," there are many instances of media coverage where plaintiff Lohrenz was identified by name. Indeed, the widespread recognition of plaintiff is a primary component of her claims against defendants-that plaintiff Lohrenz was easily identifiable because of her status as one of the first female F–14 pilots, *despite* any allegedly superficial attempt by defendants to hide her identity by referring to her only as "Pilot B."

Accordingly, it is clear to this Court that plaintiff Lohrenz was a limited-purpose public figure, albeit possibly involuntarily. Therefore, plaintiff's cross-motion for summary judgment, insofar as it seeks an Order finding that the plaintiff was a "private individual" and not a "limited purpose public figure," is DENIED. Further, because plaintiff is a limited-purpose public figure, the standard of *New York Times* applies, and in order to withstand defendants' motion for summary judgment on Counts I and IV, plaintiff must provide "the clear and convincing evidence that a reasonable jury would need in order to find that the defendant published the defamatory material with actual malice." *McFarlane v. Sheridan Square Press, Inc.,* 91 F.3d 1501, 1508 (D.C.Cir.1996).

## B. Actual Malice by Defendants

### 1. Applicable Legal Standards

Because plaintiff Lohrenz was a limited-purpose public figure, she must show that defendants acted with "actual malice" in publishing their allegedly defamatory falsehoods in order to hold defendants liable for Counts I and IV. That is, plaintiff must show that defendants knew that what they published was false or that defendants published the information with "reckless disregard" for the truth or falsity of the information. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Defendants move for summary judgment, asserting that plaintiff is unable to show that defendants acted with actual malice. Plaintiff has filed a cross-motion on the issue of malice, seeking an Order from the Court finding that defendants did act with actual malice in the publication of the allegations that plaintiff was not a qualified F–14 pilot.

■ Because of the paramount importance of First Amendment protection for the media, the showing that a public figure must make to hold a media defendant liable for slander or libel is very high.[5] The plaintiff must show that at the time of publication, defendants were aware that what they were going to publish was false or acted with "reckless disregard" for the truth or falsity of the information. *Harte–*

*Hanks Comm., Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("[T]he defendant must have made the false publication with a high degree of awareness of probable falsity.") (citation omitted); *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710; *Tavoulareas v. Piro,* 817 F.2d 762, 776 (D.C.Cir.1987) (en banc) (defendant must have "come close to wilfully blinding itself to the falsity of its utterance").

■ The standard for actual malice is not what a "reasonable person" or a "prudent publisher" would do, nor can it be defined as "an extreme departure from professional standards." *Harte–Hanks Comm., Inc.,* 491 U.S. at 665, 109 S.Ct. 2678; *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *McFarlane v. Sheridan Square Press,* 91 F.3d 1501, 1508 (D.C.Cir.1996). Further, "a newspaper's motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." *Harte–Hanks Comm., Inc.,* 491 U.S. at 665, 109 S.Ct. 2678. In order to hold defendants liable for defamation against a public figure, plaintiff must show that the actual defendants in question did, in fact, act with "actual malice." *McFarlane,* 91 F.3d at 1508.

■ Recognizing, however, that defendants are not likely to willingly confess

---

5. Plaintiff does not contest the fact that defendants Donnelly and CMR are entitled to the defamation and invasion of privacy protections available to "media defendants." Nonetheless, the Court notes that the protection of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), extends to all defamation defendants, regardless of whether they may be classified as a "media defendant" or a "non-media defendant." *See Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (affirming judgment of lower court that defendant was liable because defamatory statement was about a private is-

sue, but rejecting lower court's rationale that liability could be imposed because defendant was a non-media defendant); *Flamm v. Am. Assoc. of Univ. Women,* 201 F.3d 144 (2d Cir.2000) ("We agree [with *Dun and Bradstreet*] that a distinction drawn according to whether the defendant is a member of the media or not is untenable."); *Smith v. A Pocono Country Place Prop. Owners Assoc.,* 686 F.Supp. 1053 (M.D.Pa.1987) ("[I]n the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities.") (citation omitted).

their ill intentions, courts permit plaintiffs to prove "actual malice" by relying upon circumstantial evidence. *Harte–Hanks Comm., Inc.,* 491 U.S. at 668, 109 S.Ct. 2678. It is important to note that any evidence of actual malice must "necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication." *McFarlane,* 91 F.3d at 1508. In general, there are three types of circumstantial evidence that would likely support a finding of actual malice: (1) evidence that the story was fabricated; (2) evidence that the story was so inherently improbable that only a reckless person would have put it in circulation; or (3) the story was based wholly on a source that the defendant had obvious reasons to doubt, such as "an unverified anonymous telephone call." *St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323. A failure to investigate a proposed story or source may support an inference of actual malice only if that failure constituted a "purposeful avoidance of the truth." *Harte–Hanks Comm., Inc.,* 491 U.S. at 693, 109 S.Ct. 2678 (holding that media defendant's failure to interview critical and readily available witness supported a finding of malice); *St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323 (holding that reckless disregard may sometimes be found where there are "obvious reasons to doubt the veracity of the informant or the accuracy of his reports"); *McFarlane,* 91 F.3d at 1510 ("[I]f a defendant has reason to doubt the veracity of its source, then its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story would be evidence of its reckless disregard."). Lastly, a media defendant's "adversarial stance" may be "fully consistent with professional, investigative reporting" and is not "indicative of actual malice." *Liberty Lobby, Inc. v. Rees,* 852 F.2d 595, 601 (D.C.Cir.1988).

▮ Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party, but the non-moving party must proffer proper evidence to support any material factual assertions. *See Bennett v. Spear,* 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[A] plaintiff must set forth by affidavit or other evidence specific facts to survive a motion for summary judgment . . ."). "When the factual dispute concerns actual malice . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Nader v. de Toledano,* 408 A.2d 31, 49 (D.C.App.1979) ("There must be proof from which a reasonable jury acting reasonably could find actual malice by clear and convincing evidence before a plaintiff can survive summary judgment."). The factual issues in this case are generally not in dispute, except for a few facts of minor import, which the Court will note when appropriate. Because the parties are in general agreement about the legally significant facts and because the legal issues are identical, the Court will discuss defendants' motion for summary judgment on the issue of "actual malice" and plaintiff's partial motion for summary judgment on the issue of "actual malice" together because the legal issues are identical.

The Court will address one preliminary issue before discussing the motions for summary judgment: the date of actual "publication" by defendants of the allegations ultimately contained in the Donnelly Report. Because any analysis of liability

for the publication of defamatory falsehoods may consider only information that was known and considered by defendants *at the time of publication*, it is important for the Court to set a "cut off" date. Although neither party has adequately addressed the issue, from the complaint it appears that there are several distinct allegations of defamation of invasion of privacy, which must all be addressed separately. The first "publication" of the allegedly defamatory allegations occurred when defendant Donnelly sent her letter to Senator Thurmond, Chairman of the Senate Armed Forces Committee, on January 16, 1995. *See* Second Am. Compl. ¶ 33; *see also Croixland Prop. Ltd. Partnership v. Corcoran*, 174 F.3d 213 (D.C.Cir.1999) (recognizing a defamation claim that was based on a conversation with and letter to Senator John McCain). *Cf. Atkins v. Indus. Telecomm. Assoc., Inc.*, 660 A.2d 885 (D.C.1995) (holding that there was no publication of a letter because the letter was only sent from defendant to plaintiff). The second instance of possible defamation occurred when defendants published the Donnelly Report on April 25, 1995. *See* Second Am. Compl. ¶ 38–39. The allegations in the Donnelly Report were generally similar to those in the Thurmond letter: that plaintiff, once again referred to only as "Pilot B," was not qualified to be an F–14 pilot and had been promoted only because of her gender. The third instance of libel that is clearly alleged in the Second Amended Complaint is the press release from CMR, entitled "Navy Has a Crucial Choice: Principle or Public Relations?" which was released on November 6, 1997. *See* Second Am. Compl. ¶ 46. This press release referred to plaintiff by name and

again asserted that she was not a qualified pilot.

The only instance where plaintiffs have alleged slander is a speech given by defendant Donnelly on March 28, 1996, where defendant Donnelly allegedly republished her false and defamatory statements about plaintiff in a speech at the Army–Navy Club in Washington, D.C.[6] *See* Second Am. Compl. ¶ 52. Once again, defendant Donnelly only referred to plaintiff as "Pilot B," even though by that point it had been reported by the media that plaintiff Lohrenz was, in fact, "Pilot B."

A second fact to be considered by the Court in determining the timing of when the allegedly defamatory statements became effective is whether the references to plaintiff as "Pilot B" were sufficiently specific, or whether only the later media revelation of plaintiff Lohrenz's name effectuated the allegedly defamatory statements contained in the Thurmond letter, the Donnelly Report, and the Army–Navy Club speech. *See Croixland Prop. Ltd. Partnership v. Corcoran*, 174 F.3d 213 (D.C.Cir.1999) (holding that allegedly defamatory statement must "lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed"). Although defendants do not contest the fact that the allegedly defamatory statements did not "lead" the reader to conclude that "Pilot B" was actually plaintiff Lohrenz, the Court notes for clarity of the record that the allegations in the letter clearly did lead to plaintiff Lohrenz, and that plaintiff Lohrenz was reasonably identifiable from the letter, even if she was not

---

**6.** It is possible that the first claim of slander could run from defendant Donnelly's January 6, 1995 meeting with Adm. Arthur. That meeting is not, however, plead as an incident of slander in the complaint; in fact, it is not even mentioned. Therefore, the Court will disregard it for the purposes of these motions.

identified by name. It was well-known that there were only two women who were carrier-qualified as F–14 pilots, *see, e.g.,* Defs. Mot. for Summary Judgment, Exh. 8 to Lohrenz Dep. (October 1994 article in the San Diego *Union–Tribune* describing Lt. Hultgreen and plaintiff as the first two females qualified to perform F–14 carrier landings), the Thurmond letter identified plaintiff Lohrenz as Hultgreen's "colleague" in the F–14 squadron, *see* Defs. Mot. for Summary Judgment, Exh. 4 to Donnelly Dep. (Thurmond Letter) at 2, and the Thurmond letter and the Donnelly Report both noted that "Pilot B had reported to VF–124 at the same time as Lt. Kara Hultgreen," *id.,* Exh. 4 to Donnelly Dep. (Thurmond Letter) at 8; *id.,* Exh. 7 to Donnelly Dep. (Donnelly Rept.) at 13. The attachments to the Thurmond letter and the Donnelly Report went on to describe the alleged training record of "Pilot B" in great detail. This level of specificity is clearly sufficient for a reader, particularly one who was a member of the naval aviation community or was informed about military affairs, to readily and easily identify plaintiff Lohrenz as "Pilot B."

Therefore, for the purposes of the motions for summary judgment on the issue of actual malice, the Court will consider four separate instances of defamation/invasion of privacy: (1) the January 6, 1995 letter to Senator Thurmond; (2) the April 25, 1995 publication of the Donnelly Report; (3) the March 28, 1996 speech to the Army–Navy Club; and (4) the November 6, 1997 CMR Press Release. For the purposes of analyzing each incident and the level of defendants' possible fault, the Court will only consider information that was known and considered by defendants before each publication.

2. Defendants' Motion for Summary Judgment on the Issue of Actual Malice; Plaintiff's Cross–Motion for Partial Summary Judgment on the Issue of Actual Malice

Both parties have moved for summary judgment, each seeking a favorable ruling on the issue of "actual malice." Because the Court will hold for the following reasons that defendants are entitled to summary judgment on the issue of actual malice, for the purposes of factual description the Court will view the proffered deposition testimony, affidavits, and other competent evidence in the light most favorable to the plaintiff.

■ Before analyzing the specific instances of allegations of defamation and invasion of privacy, the Court will reject one argument by plaintiff which applies to the complaint generally. Plaintiff alleges that actual malice may be inferred because "Elaine Donnelly had a pre-existing agenda of opposing women in military combat jobs." Pl. Cross–Mot. for Summary Judgment at 34. Any "pre-existing agenda," even one which may be noxious to some minds, is not indicative of actual malice, and this argument may therefore be summarily rejected. *See Liberty Lobby, Inc. v. Rees,* 852 F.2d 595, 601 (D.C.Cir.1988).

a. The Thurmond Letter–January 16, 1995

■ In determining actual malice, the first finding to which the Court must attend is identifying those sources upon which defendants did rely in publishing the alleged libel. Defendants assert that they relied upon information from Lt. Burns, Capt. W. Stewart "Bud" Orr, and Adm. Richardson. The timing, however, of the consultation between defendants, Orr, and Richardson is in doubt, and defendant herself acknowledged in her deposition that she relied only on the information provided by Lt. Burns. Pl. Cross–Mot. for Summary Judgment, Exh. 13 (Donnelly Dep.) at 193. Viewing the facts in light most favorable to plaintiff, the Court finds that

defendant Donnelly relied solely upon information from Lt. Burns in drafting the letter to Senator Thurmond.[7] As stated above *supra* section III.B.1, defendants need only show that at the time they published the Thurmond letter, they had no actual knowledge of the falsity of the information, nor did they recklessly disregard indications that the information might be false.

Plaintiff asserts that "there were obvious reasons to doubt the veracity of the [sic] Lt. Burns, yet Donnelly used him anyway as her sole source." Pl. Cross–Mot. for Summary Judgment at 36. Plaintiff asserts that Donnelly failed to properly investigate Lt. Burns' background and level of interaction with plaintiff Lohrenz. Viewing the evidence in the light most favorable to plaintiff, Burns first contacted defendant Donnelly by telephone sometime in late November, 1994, shortly after the death of Lt. Hultgreen. *See* Pl. Cross–Mot for Summary Judgment, Exh. 13 (Donnelly Dep.) at 179. Burns told defendant Donnelly that he had been one of the instructors of Lt. Hulgreen and of plaintiff, and that they had been trained differently from the other male pilots. *See id.*, Exh. 13 (Donnelly Dep.) at 179. Defendant Donnelly asked Burns about his experiences with Lt. Hultgreen and with plaintiff; Burns identified himself as a lieutenant. *See id.*, Exh. 13 (Donnelly Dep.) at 183–84. Defendant Donnelly then asked Burns to write a letter describing his concerns. *See id.*, Exh. 13 (Donnelly Dep.) at 181. Burns did so, and defendant Donnelly received a letter sometime mid-December

1994. *See id.*, Exh. 13 (Donnelly Dep.) at 188–89; Defs. Mot. for Summary Judgment, Exh. 1 to Burns Dep. (Burns letter). In the letter, Burns once again represented that he had been one of Lt. Hulgreen's and plaintiff's instructors. *See* Defs. Mot. for Summary Judgment, Exh. 1 to Burns Dep. (Burns letter). Burns described in detail many of the intricacies of F–14 training, piloting and scoring, and described in particular detail Lt. Hultgreen's training and areas where he believed that Lt. Hultgreen had been permitted to advance where male pilots would not. *See id.*, Exh. 1 to Burns Dep. (Burns letter). Burns then described plaintiff Lohrenz's flight training history on the F–14 with a similar level of detail, and gave his opinion that she was not a qualified F–14 pilot. *See id.*, Exh. 1 to Burns Dep. (Burns letter). Even viewing the evidence in the light most favorable to the plaintiff, this Court's review of the letter sent from Lt. Burns to defendant Donnelly clearly reveals the letter as one that would not be immediately suspect or one that would provide "obvious reasons" to doubt its veracity; much to the contrary, the letter is replete with technical vocabulary, dates, scores, and details that appear to validate the experience and knowledge of the author. Defendants' reliance on the letter from Lt. Burns does not suggest any knowledge of falsity or of reckless disregard for the truth. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (holding that reckless disregard for reliance upon a source may only be found where there are "obvious

---

7. Even if defendant Donnelly did consult with Orr or Richardson, it is uncontested that Lt. Burns was the primary source of information. Orr and Richardson provided, at most, technical information about naval aviation terminology. *See* Pl. Cross–Mot for Summary Judgment, Exh. 13 (Donnelly Dep.), at 191–96. Defendant Donnelly did not show them the letter from Lt. Burns, nor did she solicit their opinions about the training or qualifications of plaintiff Lohrenz. *Id.* at 193 ("I prob-

ably asked Admiral Richardson some generic questions about [the letter from Lt. Burns], I probably asked Bud Orr, just to make sure I had my terms correct ..."); Defs. Mot. for Summary Judgment, Donnelly Aff. ¶ 9–10 ("Captain Orr provided background information to [defendant Donnelly] and answered questions regarding technical aviation terms ..."); Pl. Cross–Mot. for Summary Judgment, Exh. 16 (Orr Dep.), at 210–12.

reasons to doubt the veracity of the informant or the accuracy of his reports").

Indeed, plaintiff's own concessions show that defendant is entitled to summary judgment on the issue of actual malice. Plaintiff concedes that defendant Donnelly: (1) did ask Lt. Burns about the extent of his interactions with Lt. Hultgreen and plaintiff Lohrenz, (2) did learn that Burns was a lieutenant who would be able to send her the training records of Lt. Hultgreen and plaintiff Lohrenz; (3) did learn that Lt. Burns was an instructor for Lt. Hultgreen and plaintiff Lohrenz; and (4) did ask Lt. Burns to put his statements in writing. *See* Pl. Cross–Mot. for Summary Judgment at 34–38. Although plaintiff asserts that defendant Donnelly failed to confirm any aspects of Lt. Burns identity or credentials beyond ascertaining that he was a lieutenant, did not suspect that there was anything wrong with a lieutenant sending her the training records of two other pilots when Navy regulations apparently bar that action, did not in more detail determine the extent of Lt. Burns' involvement in plaintiff Lohrenz's training, and did not discuss his length of service as an instructor, these "faults" are not legally significant. Defendants failed to exhaustively research the background of Lt. Burns' because there were no "obvious reasons" for defendant Donnelly to suspect the fallibility of her source. Lt. Burns provided his identity and background, and provided her with a letter detailing his opinions and reasons therefor.

The information obtained and considered by defendant Donnelly clearly puts her outside the narrow range of cases where courts have held that media defendants did act with "actual malice." For example, in *Harte–Hanks Communications, Incorporated v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), the Supreme Court affirmed a decision to hold a newspaper liable for publishing defamatory falsehoods about plaintiff, a candidate for judicial office, asserting that plaintiff had attempted to bribe grand jury witnesses. The defendant's sole source was a single witness whose claims were somewhat incredible-she asserted that defendant had promised to take her and her sister to dinner at an expensive French restaurant if he won the election, that he would buy a restaurant for her parents if he won the election, and other fantastic claims. *Id.* at 671–73, 109 S.Ct. 2678. The witness asserted that her claims could be proven by a tape-recorded interview session with plaintiff and seven other individuals; six of the individuals were either related to, were friends with, or worked for the plaintiff. The seventh individual was the witness' sister. The defendant refused to listen to the tape, but then proceeded to interview the six individuals who were related to, friends with, or worked for the plaintiff-that is, witnesses who could be discredited if they disagreed with defendant's allegations. All six denied that any promises had ever been made, and the defendant proceeded to thoroughly discredit them because of their relationship with the plaintiff. The defendant failed to interview the last individual-the sister of the witness-even though she was readily available, because she was the only individual present during the taped interview that the defendant could not easily discredit. *Id.* at 682, 109 S.Ct. 2678. Clearly, the facts of that case show a clear evasion from the truth-the refusal to listen to the actual tape, the failure to interview the most important witness, who was easily accessible-that is not present in this case. *See also McFarlane v. Sheridan Square Press*, 91 F.3d 1501 (D.C.Cir.1996) (finding no actual malice where defendant relied upon source who had been known to fabricate facts and whose story was uncorroborated); *McFarlane v. Esquire Magazine*, 74 F.3d 1296

(D.C.Cir.1996) (same). In this case, defendants did verify the identity and position of Lt. Burns, did obtain written copies of Lt. Burns position, and did examine carefully and closely the materials submitted by Lt. Burns. Defendants were entitled to rely upon the representations of Lt. Burns in publishing the Thurmond letter, and defendants may not be held liable for their failure to conduct further investigation. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

Plaintiff's next argument is that defendant Donnelly was "specifically and repeatedly warned that she was relying on false data from an unreliable source" before the publication of the Thurmond letter. Pl. Cross–Mot. for Summary Judgment at 38. The Court is unable to conclude that Donnelly was "specifically and repeatedly warned" that her information was false. Plaintiff relies upon several meetings between defendant Donnelly and Admiral Stanley Arthur, wherein Arthur told defendant Donnelly that he disagreed with her conclusions and Arthur showed Donnelly a copy of a report prepared by Rear Adm. Lyle G. Bien. The only meeting that occurred *before* the Thurmond letter, however, was their first meeting on January 6, 1995, where defendant Donnelly showed Arthur some information she had received from Burns and told Arthur about her suspicions. Arthur made no comment on her conclusions but did promise that he would investigate her charges.[8] *See* Pl. Cross–Mot. for Summary Judgment, Exh. 13 (Donnelly Dep.) at 220–21. Accordingly, no suggestion of actual malice may be drawn from defendant Donnelly's January 6, 1995 meeting with Adm. Arthur.

Plaintiff's final argument is that defendants "never attempted to present a complete view of Lohrenz's training or even to learn what the complete records showed." Pl. Cross–Mot. for Summary Judgment at 43. It is true that defendant Donnelly sent the Thurmond letter before she ever actually received plaintiff Lohrenz's training records. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 13 (Donnelly Dep.) at 205. As stated above however, the letter from Lt. Burns contained detailed and specific descriptions of the training records of Lt. Hultgreen and of plaintiff Lohrenz. Defendants' failure to attempt to obtain actual copies of plaintiff's training records does not evidence "actual malice." There is no duty for a defamation defendant to conduct further investigation, unless the failure to conduct further investigation was so glaringly deficient that the Court could infer that defendants acted with "reckless disregard." *Harte–Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). There is an insufficient basis for the Court to find that a reasonable juror could conclude that defendants acted with reckless disregard in their failure to conduct further investigation into plaintiff Lohrenz's training records before publishing the Thurmond letter.

On the record now before the Court, the Court finds that defendants' Motion for Summary Judgment will be GRANTED and plaintiff's Motion for Partial Summary Judgment will be DENIED, insofar as those motions addresses "actual malice" in the publication of the Thurmond letter.

b. The Donnelly Report–April 25, 1995

The Court must determine, viewing the evidence in the light most favorable to the

---

**8.** Plaintiff asserts that defendant Donnelly spoke with Admiral Stanley Arthur three other times, met with Adm. Mike Boorda, and spoke at least once with Commander Thomas Sobieck. Because these conversations occurred after the Thurmond letter, they will be discussed *infra* section III.B.2.b.

plaintiff, what information was considered by defendants before the publication of the allegedly false and defamatory statements on April 25, 1995. Obviously, the information possessed by defendants before the Thurmond letter, discussed *supra* section III.B.2.a, continued to be in defendants' possession, and so the Court will incorporate that discussion here and will discuss in this section only those events that occurred between the publication of the Thurmond letter on January 16, 1995 and the publication of the Donnelly Report on April 25, 1995.

On or about March 3, 1995, Lt. Burns sent defendant Donnelly copies of *portions* of plaintiff's training records. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 13 (Donnelly Dep.) at 227–28, 332; Defs. Mot. for Summary Judgment, Exh. 3 to Burns Dep. (Burns second letter) ("Dear Elaine, Please find enclosed the flight training records that you and I disucussed. I realize that there is a lot of material here to digest and therefore, have tried to streamline and organize all of the documents in a logical manner."). Defendants reviewed those records, had Capt. Orr review the records, Pl. Cross–Mot for Summary Judgment, Exh. 13 (Donnelly Dep.) at 351–52, and discussed the records with Adm. Arthur, *id.,* Exh. 13 (Donnelly Dep.) at 259–63. Orr expressed the opinion that plaintiff was not a qualified pilot. *See id.,* Exh. 16 (Orr Dep.) at 196–97, 210–11. Adm. Arthur neither confirmed nor denied the records shown to him by defendant Donnelly, but did tell her that he strongly disagreed with her conclusions. *See id.,* Exh. 11 (Arthur Dep.) at 35–44; *id.,* Exh. 13 (Donnelly Dep.) at 259–63.

During the period of time after the publication of the Thurmond letter but before the Donnelly Report, defendant Donnelly had several additional meetings with Navy officers. During the period after the publication of the Thurmond letter but before the publication of the Donnelly report, defendant Donnelly met with Adm. Arthur twice (February 8, 1995 and March 24, 1995), spoke on the telephone once with Adm. Arthur (March 6, 1995), met with Adm. Mike Boorda once (March 6, 1995), and spoke once with Cmdr. Thomas Sobieck (date unknown). At each meeting, defendant Donnelly was told that her conclusions were incorrect. On February 8, 1995, Adm. Arthur cautioned defendant Donnelly that "it appeared ... that whoever was providing the information was providing selected parts of the information," that it appeared that defendant Donnelly was receiving information from a person who "had an agenda," and that she should be careful about the conclusions that she might draw from the information. *See id.,* Exh. 11 (Arthur Dep.) at 41, 51, 52, 53. Plaintiff asserts that Adm. Arthur flatly told defendant Donnelly that her allegations were false and that Lt. Hultgreen and plaintiff Lohrenz were qualified pilots. On March 6, 1995, defendant Donnelly met with Adm. Boorda; he told defendant Donnelly that he believed that plaintiff was a well-qualified F–14 pilot, and that he disagreed strongly with the conclusions that she had drawn. *See id.,* Exh. 13 (Donnelly Dep.) at 200, 267–68. That evening, defendant Donnelly spoke on the telephone with Arthur, and he repeated his belief that the allegations were false, and that defendant Donnelly was receiving information from a "disgruntled aviator." *See id.,* Exh. 13 (Donnelly Dep.) at 268–69. On March 24, 1995, defendant Donnelly met again with Arthur. At this third meeting, defendant Donnelly did have copies of portions of plaintiff's training records, and she reviewed those records with Arthur. Defendant Donnelly was also allowed to read a copy of a report authored by Rear Admiral Lyle G. Bien, *see id.,* Exh. 11 (Arthur Dep.) at 46–47, which was specifically prepared in re-

sponse to the allegations that defendant Donnelly had raised at the first meeting with Adm. Arthur. The Bien Report actually validated much of the underlying information in the possession of defendant Donnelly. *See id.*, Exh. 11 (Arthur Dep.) at 53. The Report did conclude that the facts contained in the Thurmond letter were "largely accurate" and that Bien had "found evidence of special considerations given to three female aviators ... [and] in the case of [plaintiff], significantly greater concessions were made." *Id.*, Exh. 9 (Bien Rept.). It did, however, dispute many of her facts; contrary to the facts cited by defendant Donnelly, Bien noted that there were two male pilots who had scores lower than plaintiff's, there were no instances where male students had been permanently disqualified with scores higher than plaintiff's, and the allegation by Donnelly that an instructor had changed one of plaintiff's scores from a "down" to an "up" was false. *Id.*, Exh. 9 (Bien Rept.). The Bien Report also disagreed with defendant Donnelly's conclusions that female and male aviators had been subject to different standards, and that plaintiff Lohrenz was not a qualified pilot. *See id.*, Exh. 9 (Bien Rept.).

Lastly, plaintiff asserts that shortly before the publication of the Donnelly Report, defendants were contacted by telephone by the commanding officer of the FRS, Commander Thomas Sobieck. *See id.*, Exh. 13 (Donnelly Dep) at 375–76. Sobieck apparently called defendant Donnelly to discuss primarily the Tailhook scandal, *see id.*, Exh. 13 (Donnelly Dep.) at 352, 376. The evidence describing the substance of the conversation is muddled, but viewing the evidence in the light most favorable to the plaintiff, it appears that Sobieck told defendant Donnelly that there were no safety-of-flight concerns about plaintiff, that plaintiff's training record should not have resulted in the convening of an FNAEB, and that the same stan-

dards were applied to male and female aviators. *See id.*, Exh. 13 (Donnelly Dep.) at 374–402. Sobieck did, however, admit that plaintiff had been a "timid" flier, that she often repeated errors that she had made before, and that she was struggling. *Id.*, Exh. 13 (Donnelly Dep.) at 353–54. Shortly thereafter, the Donnelly Report was published.

█ Plaintiff asserts that the events described support an inference of "actual malice" because defendant Donnelly was informed clearly and repeatedly that her information was incorrect, because defendant Donnelly never sought to obtain a full copy of plaintiff's training records, because defendant Donnelly selectively edited the portion of plaintiff's training records that she did have in her possession, and because the Donnelly Report contained factual errors. On the extensive record now before the Court, the Court finds that summary judgment in favor of defendants is appropriate because plaintiff has not shown that defendants acted with "actual malice" in publishing the Donnelly Report.

First, although defendant Donnelly did meet several times with Navy officers who disagreed strenuously with her conclusions, no inference of malice may be drawn. Between the publication of the Thurmond letter and the Donnelly Report, it appears that defendant Donnelly did make attempts to investigate the veracity of the information contained in the December letter from Lt. Burns and the copies of plaintiff's training records sent to defendants from Lt. Burns. As part of her investigation, defendant met several times with Navy officials and reviewed at least one Navy report. The interactions between defendant Donnelly and Navy officials can only be characterized as partial agreement and partial disagreement; that is, Arthur, Bien, and Sobieck all confirmed that defendant Donnelly had some correct facts concerning plaintiff's training rec-

ords, but they all disputed the conclusions that she had drawn from those records. Lt. Burns, also a Navy officer, had told defendant Donnelly that plaintiff was not a qualified pilot, and that the Navy had applied double standards. Even viewing the evidence in the light most favorable to the plaintiff, it appears that there was an historical record that is probably common to issues of great public interest and debate-facts and conclusions that are hotly contested, but are open to vastly different interpretations, all of which are protected by the First Amendment. No actual malice may be inferred from these disputes between defendants and the Navy officials.

Second, no inference of malice may be inferred defendant Donnelly's failure to obtain full and complete copies of plaintiff's training records. There is no duty for a defamation defendant to conduct further investigation, unless the failure to conduct further investigation was so glaringly deficient that the Court could infer that defendants acted with "reckless disregard." *Harte–Hanks Comm., Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). There is an insufficient basis for the Court to conclude that defendants acted with reckless disregard in their failure to conduct further investigation into plaintiff Lohrenz's training records before publishing the Donnelly Report, because defendant Donnelly did obtain portions of plaintiff's training records, did confirm that facts contained in those records were correct, and did base her publication on those portions.

Third, no inference of malice may be drawn from defendant Donnelly's "selective editing" and labeling of plaintiff's training records, even if the editing and labeling did create a false impression that plaintiff was not a qualified pilot. It is generally accepted that media defendants are not compelled to publish the entirety of their sources and may edit or abridge their sources as they see fit. *See McFarlane v. Esquire Magazine, et al.,* 74 F.3d 1296, 1306–07 (D.C.Cir.1996) (holding that defendants did not act with "actual malice" when they selectively edited out remarks which would have cast doubt upon the integrity of their primary source). This is particularly applicable in the instant case, because defendants included a specific note in the Donnelly Report that the "[d]ocuments presented in this compendium of information have been selected to demonstrate a pattern of flexible or double standards in naval aviation."[9] *See* Pl. Cross–Mot. for Summary Judgment, Exh. 17 (Donnelly Report) at 3.

Fourth, no inference of actual malice may be drawn from the fact that the Donnelly Report did allegedly contain some misstatements of fact.[10] Defendant Don-

---

9. In support of her argument, plaintiff proffered the Declaration of Captain Charles Nesby, who concluded that

[t]he selective use of a few records, the misrepresentations of the meaning of the records she did use, and the magnitude of the deception dictates only one conclusion-that Elaine Donnelly and the people who helped her intended to deceive the Senate Armed Services Committee, Lt. Lohrenz's superiors in her chain of command, and, after release of the CMR report, Lt. Lohrenz's fellow officers and the general public.

Pl. Cross–Mot. for Summary Judgment, Exh. 1 (Nesby Decl.) at 13. As previously dis-

cussed, the Court does not accept any part of Captain Nesby's Declaration which might be construed as a legal conclusion. Captain Nesby may be qualified as an expert to interpret, explain, and compare the training records of an F–14 pilot, but he is not qualified to make any conclusions about the subjective intent of defendants in any legal sense. *See supra* § II.A.

10. Rear Adm. Bien prepared a supplemental report in response to the Donnelly Report. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 10 (Bien Suppl. Rept.). That report noted that although the facts of the Donnelly Report were "largely accurate," *id.,* Exh. 10

nelly did take care in verifying her facts and sources sufficient to preclude summary judgment for the plaintiff. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1511–13 (D.C.Cir.1996) (finding no actual malice where defendant knew that source had credibility problems, and there were incongruities between source's representation that he had been at a meeting in Paris and the stamps in his passport). The Court will not impose liability for mere factual error-an everyday occurrence in journalism-unless those errors rise to the level of circumstantial evidence of "actual malice." The errors in the Donnelly Report did not rise to that level. *See id.*

On the record now before the Court, the Court finds that defendants' Motion for Summary Judgment will be GRANTED and plaintiff's Motion for Partial Summary Judgment will be DENIED, insofar as those motions addresses "actual malice" in the publication of the Donnelly Report.

c. The Army–Navy Club Speech–March 28, 1996

■ The Court's discussion of the information possessed and considered by defendants will, of course, incorporate the Court's prior discussion about the information known to defendants before the publication of the Thurmond letter and the Donnelly Report, discussed *supra* sections III.B.2.a and III.B.2.b. Only two events of note occurred between the April 25, 1995 publication of the Donnelly Report and the March 28, 1996 Army–Navy Club speech that might have had any effect on the information known to defendants. First, on May 4, 1995, Rear Adm. Bien published

a Supplemental Report in response to the Donnelly Report. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 10 (Bien Suppl. Rept.). Second, defendant Donnelly had a second conversation with Cmdr. Thomas Sobieck on May 2, 1995 about the Donnelly Report. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 13 (Donnelly Dep.) at 376.

The Bien Supplemental Report came to generally the same conclusions as the original Bien Report-that the bulk of the information reported by defendant Donnelly was correct, but that she had come to the wrong conclusion about plaintiff's flight qualifications and the issue of "double standards" in the military. *Compare* Pl. Cross–Mot. for Summary Judgment, Exh. 9 (Bien Rept.), *with id.*, Exh. 10 (Bien Suppl. Rept.). In his Supplemental Report, Bien asserts that the Donnelly Report was driven by her own political agenda, but he conceded that "the sections discussing the training records of the female aviators are largely accurate." *Id.*, Exh. 10 (Bien Suppl. Rept.). Ultimately, no inference of "actual malice" may be drawn from the Bien Supplemental Report because the Supplemental Report did partially confirm many of defendant Donnelly's facts (although strongly disputing the ultimate conclusions that she drew from those facts), and because the substance of the Bien Supplemental Report is generally very similar to the original Bien Report, and as discussed *supra* section III.B.2.b, no inference of actual malice could be drawn from the original Bien Report.

The May 2, 1995 conversation between Sobieck and defendant Donnelly similarly leads to no inference of "actual malice." Viewing the evidence in the light most

(Bien Suppl. Rept.) at 1, there were three specific misstatements of fact. First, Bien asserts that it was untrue that plaintiff had the lowest night carrier-qualification grades in the history of the FRS. Second, Bien found that contrary to the Donnelly Report, many

Navy officers were actually predisposed to see the female aviators *fail*. Third, Bien asserted that the allegation that Sobieck had improperly changed one of plaintiff's scores from a "down" to an "up" was incorrect.

favorable to the plaintiff, Sobieck told defendant Donnelly that standards were never lowered in order to assure the promotion of plaintiff, that there were no safety-of-flight concerns about plaintiff, that plaintiff's record should not have supported the convening of an FNAEB, and that plaintiff's grades were never changed in order to prevent her dismissal from the FRS. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 15 (Jenckins Notes). Sobieck neither confirmed nor denied any of the facts in the Donnelly Report, except to say that he had not changed any of plaintiff's scores, as had been alleged in the Donnelly Report. *Id.*, Exh. 15 (Jenckins Notes). This conversation may not be the basis for any inference of "actual malice"; as has been discussed by the Court, defendant Donnelly had previously encountered these same statements from Navy officials, and may not be held liable for her decision to publish a statement that contradicted the beliefs and conclusions of the Navy officials. No inference of "actual malice" may be drawn from Sobieck's further response to defendant Donnelly after the publication of the Donnelly Report.

Lastly, even to the extent that the Bien Supplemental Report and the May 2, 1995 conversation with Sobieck might have changed or altered the information known to defendants or pointed out factual errors in the Donnelly Report, there is no duty to retract or correct a publication, even where grave doubt is cast upon the veracity of the publication after it has been released. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C.Cir.1996).

On the record now before the Court, the Court finds that defendants' Motion for Summary Judgment will be GRANTED and plaintiff's Motion for Partial Summary Judgment will be DENIED, insofar as those motions addresses "actual malice" in the publication of the Army–Navy Club speech.

**d. The CMR Press Release–November 6, 1997**

The Court must discuss "actual malice" for the CMR press release of November 6, 1997 separately because between the Army–Navy Club speech in March of 1996 and November of 1997, the Navy Inspector General released a report of its investigation of, in part, the allegations made by plaintiff and her parents about the Navy's decisions to remove plaintiff from the F–14 carrier training program. That Report was released on February 10, 1997; on November 6,1997, defendants issued a press release that noted, among other comments about plaintiff, a "pattern of major errors, low scores, and preferential treatment for ... Carey Dunai Lohrenz." *See* Second Am. Compl., Exh. 13 (November 1997 CMR press release).

The Navy Inspector General Report made the following conclusions which are relevant to these motions: (1) plaintiff was not given preferential treatment while she was training in the FRS; (2) after being assigned to the FRS, plaintiff's flying techniques became dangerous, and she continued her techniques after many attempts by instructors to correct her; (3) plaintiff knew that her performance was substandard and received ample counseling and advice; (4) the FNAEB Report was flawed, but the conclusions were ultimately fair and correct; and (5) that plaintiff's performance was negatively affected by media attention and stress. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 5 (Inspector Gen. Rept.) at v-vi. Plaintiff asserts that because defendants continued to publish defamatory falsehoods about plaintiff, even after the issuance of the Navy Inspector General Report (which plaintiff

alleges conclusively rebuts the Donnelly Report), clear and convincing evidence of "actual malice" exists.[11]

Contrary to plaintiff's assertion that the Navy Inspector General Report conclusively rebutted the Donnelly Report, even viewing the evidence in the light most favorable to plaintiff, the Report followed the same pattern of partial agreement and partial disagreement that characterized defendants' interactions with the Navy. The Report considered plaintiff's landing techniques, and found that although her performance upon reporting to the U.S.S. Lincoln was good, it declined in late 1994. Pl. Cross–Mot. for Summary Judgment, Exh. 6 (Inspector Gen. Rept.) ¶¶ 268–91. Although the Report noted that plaintiff's reviews included such comments as "talented pilot, smooth," "willingness to learn," and a "capable aviator," plaintiff was also criticized for being "not as aggressive as she needs to be," not having "progressed with her peers,"and for being "inconsistent," "sporadic," "high and overpowered," and "unsafe." *Id.*, Exh. 6 (Inspector Gen. Rept.) ¶¶ 277–78. In the end, the Navy Inspector General concluded that the FNAEB Report had been correct in concluding that plaintiff was not a suitable

pilot for the carrier environment, *id.*, Exh. 6 (Inspector Gen. Rept.) ¶¶ 300–01, because she did not rate well on factors such as "receptivity to instruction," "response to [landing signals officers]," " trend of improvement," and "officer-like qualities," *id.*, Exh. 6 (Inspector Gen. Rept.) ¶ 438.

The Inspector General Report also examined the proceedings and recommendations of the FNAEB, which concluded that plaintiff should be removed from the F–14 carrier program. Plaintiff and her parents made the following complaints about the FNAEB Report and its implementation[12]: (1) male landing signal officers graded female aviators more stringently than male aviators; (2) the FNAEB should not have been convened at all, for various reasons; (3) plaintiff was given no warning that the FNAEB was to be convened, while male pilots were given warnings; and (4) there were inconsistencies, inaccuracies and emotionalism in the FNAEB Report. *Id.*, Exh. 6 (Inspector Gen. Rept.) ¶ 315. The Navy Inspector General concluded that the bulk of the complaints against the FNAEB were unsubstantiated. *Id.*, Exh. 6 (Inspector Gen. Rept.) ¶¶ 335, 347, 358, 414, 471. The Report did, however, find that there was

---

11. Plaintiff also asserts that even if her performance level did decline to the level at which she should have been released from her training program, the fault lies with defendants because her decline was caused by the stress which resulted from the Thurmond letter, the Donnelly Report, and the subsequent Navy investigations and media attention. The Inspector General Report did conclude that the media attention in general, from the Donnelly Report and other parties and before and after the death of Lt. Hultgreen, had caused stress upon the plaintiff that was a contributing factor to plaintiff's poor performance. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 6 (Inspector Gen. Rept.) ¶¶ 155–68, 182–264. The Inspector General Report made, however, no conclusion about whether plaintiff should have been returned to flight status if she were treated for her extreme stress. *Id.*,

Exh. 6 (Inspector Gen. Rept.) ¶ 267. The Report did conclude that as a result of the stress plaintiff suffered, that when she appeared before the FNAEB, plaintiff was not physically qualified to fly. *Id.*, Exh. 6 (Inspector Gen. Rept.) ¶¶ 264, 314. Further, the causes of plaintiff's stress may be relevant to the Navy's evaluation of plaintiff or perhaps even a debate about the political utility of defendants' Report, but are not relevant to an analysis of whether defendants acted with "actual malice" in the 1997 press release.

12. As discussed in the factual background of this case, the FNAEB Report recommended that plaintiff be permitted to retain her flight status, but that she be removed from a carrier-based environment. Plaintiff's commanding officer rejected the recommendation, and removed plaintiff from flight status entirely.

substantiation for the allegation that there were "inconsistencies, inaccuracies and emotionalism" in the Report because plaintiff's commanding officer had made comments about whether plaintiff's possible retention of her flight status would be fair to involuntarily separated reservists (other Navy aviators who had been, in effect, laid off by the military's "right-sizing" program) and how it might affect "fleet morale." *Id.,* Exh. 6 (Inspector Gen. Rept.) ¶¶ 416–37. The Inspector General concluded that those remarks and considerations were inappropriate and irrelevant to the FNAEB process, that the offending remarks should be removed from the FNAEB Record, and that the FNAEB's recommendation that plaintiff retain her flight status (but in a non-carrier environment) should have been accepted by plaintiff's commanding officer. *Id.,* Exh. 6 (Inspector Gen. Rept.) ¶¶ 438–44. Nonetheless, the Inspector General concluded the FNAEB Record as a whole was consistent and justified. *Id.*

The Navy Inspector General Report, therefore, was mixed in its conclusions. While noting that there had been inconsistencies in the FNAEB Report, the Inspector General concluded that plaintiff did have performance problems and that the recommendations of the FNAEB Report were supportable. In terms of the issue of double standards, the Navy Inspector General did conclude that plaintiff had been subject to the same standards as the male pilots-but this conclusion is the same as the Bien Report and the Bien Supplemental Report, as well as the prior oral representations of Arthur, Boorda, and Sobieck. As discussed, the Navy's mere disagreement with defendants' conclusions cannot support a finding of "actual malice." Particularly because defendants did receive confirmation of many of the underlying facts upon which they based their allegedly defamatory falsehoods, under the First Amendment defendants are allowed to view, and publicize their view, that the conclusions of the Navy Inspector General, Bien, Arthur, Boorda, and Sobieck were merely the Navy's "party line." Though the Navy Inspector General Report appears to be the most detailed and conclusive investigation into the personnel decisions made by the Navy about plaintiff, plaintiff has failed to show that the findings of the Report support any inference that defendant acted with actual malice.

On the record now before the Court, the Court finds that defendants' Motion for Summary Judgment will be GRANTED and plaintiff's Motion for Partial Summary Judgment will be DENIED, insofar as those motions addresses "actual malice" in the publication of the CMR Press Release.

In sum, because defendants have shown that there are no issues of material fact in dispute and that defendants are entitled to judgment as a matter of law on the issue of "actual malice," the Court will GRANT defendants' Motion for Summary Judgment, will DENY plaintiff's Motion for Partial Summary Judgment, and will grant judgment for defendants on Counts I and IV.

### 3. Other Issues Raised by Defendants' Motion for Summary Judgment

Defendants assert that they are entitled to summary judgment on Counts I and IV on the alternative grounds that the allegations published in the Thurmond letter, the Donnelly Report, the Army–Navy Club speech and the CMR press release were "substantially true." Defendants also assert that plaintiff's claims which seek relief for statements that were published by defendants based on the Report of the Navy Inspector General are barred by the "Fair Reporting" doctrine. Although the Court has already held that defendants are entitled to summary judgment on Counts I

and IV, the Court will briefly discuss these issues for the clarity of the record.

#### a. "Substantial Truth" Doctrine

▆▆▆▆▆ It is established law that truth is an absolute defense to an action for defamation. *Olinger v. Am. Savings and Loan Assoc.*, 409 F.2d 142, 144 (D.C.Cir. 1969). To successfully assert this defense, a defendant in a defamation action must prove that the statements made were substantially true, and that any minor misstatements of fact or inaccuracies of expression were immaterial. *Moldea v. New York Times*, 22 F.3d 310, 318 (D.C.Cir. 1994). A finding that a statement was "substantially true" precludes a finding of "actual malice." *Liberty Lobby v. Rees*, 852 F.2d 595, 601 (D.C.Cir.1988).

▆▆▆ Defendants assert that their statements in the Thurmond letter, the Donnelly Report, the Army–Navy Club speech, and the CMR Press Release were "substantially true" because the Bien Report and the Bien Supplemental Report, discussed *supra* sections III.B.2, concluded that the facts included in the Thurmond letter and the Donnelly Report were "largely accurate." *See* Defs. Mot. for Summary Judgment, Exh. 6 to Donnelly Dep (Bien Rept.); *id.*, Exh 8 to Donnelly Dep. (Bien Suppl. Rept.). On the basis of these comments and other negative comments in the Navy record about plaintiff's flying abilities, defendants move this Court to conclude that plaintiff was, in fact, an inadequate pilot who was promoted solely because of double standards. This the Court cannot do.

Contrary to defendants' assertion that the record "unequivocally" establishes the issue of double standards and of plaintiff's flying abilities, the record is extremely muddled. While it does appear true that plaintiff did have some difficulties in piloting and landing F–14's in a carrier environment, it is equally true that *every pilot* has difficulty completing these difficult tasks. It is highly contested whether plaintiff's records and scores were above or below the minimum required, the causes for the possible decline in plaintiff's performance, and whether plaintiff's original assignment to the FRS was a result of merit, political pressure, or both. Every report and statement issued by the Navy has definitively concluded that although plaintiff Lohrenz may not have been suited for some types of piloting, she was promoted because of her abilities and not because of any alleged "double standards." Plaintiff has also submitted multiple declarations from knowledgeable individuals that plaintiff was, in fact, a highly qualified pilot who performed well at the FRS. *See* Pl. Cross–Mot. for Summary Judgment, Exh. 2 (Kilian Decl.); *id.*, Exh. 3 (Carel Decl.); *id.*, Exh. 7 (Whetstone Decl.); *id.*, Exh. 8 (Marotta Decl.). Therefore, the Court cannot conclude that defendants' statements were "substantially true."

#### b. "Fair Reporting" Doctrine

▆▆▆ In the District of Columbia, the publication of defamatory material concerning a plaintiff in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern will not subject a defendant to liability for defamation if the report is accurate and complete or a fair abridgment of the occurrence reported. *Harper v. Walters*, 822 F.Supp. 817, 823 (D.D.C. 1993). "Once a report is deemed 'official,' an *accurate* publication of its contents is privileged, regardless of their veracity," *id.* (emphasis added); that is, the privilege will not apply if the publication of the report is not fair and accurate, *id.* Defendant now asserts that the November 6, 1997 CMR press release, which noted a "pattern of major errors, low scores, and preferential treatment for … Carey Dunai Lohrenz" and also that plaintiff Loh-

renz was "unsafe, undisciplined, and unpredictable," *see* Second Am. Compl., Exh. 13 (November 1997 CMR press release), is protected by the "fair reporting" doctrine.

The Court found *supra* section III.B.2 that defendants did not publish with "actual malice" the Thurmond letter, the Donnelly Report, the Army–Navy Club speech, or the CMR Press Release. Defendants' motion, insofar as it is based upon the application of the fair reporting doctrine, would require this Court to make a finding regarding the "fairness" and "accuracy" of defendants' reporting of the Bien Report, the Bien Supplemental Report, and the Navy Inspector General Report. Because the Court has already held that defendants are entitled to summary judgment on the issue of actual malice, there is no need for the Court to determine whether the Fair Reporting doctrine applies, so the Court declines to make any finding as to whether defendants' publications were "fair" or "accurate" representations of the Navy reports.

IV. Conclusion

Pursuant to the analysis of this Memorandum Opinion, the Court will DENY defendants' Motion to Strike [139], GRANT defendants' Motion for Summary Judgment [119–1], DENY defendants' Motion for Oral Hearing [119–2], and DENY plaintiff's Cross–Motion for Partial Summary Judgment [133].

A separate Order accompanying this Memorandum Opinion will issue this day.